1997-NMCA-062

943 P.2d 136

**Filiberto RODRIGUEZ, Worker–Appellee,**

v.

**LA MESILLA CONSTRUCTION COMPA-
NY, Self–Insured Employer through Ad-
ministrator Hospital Services Corpora-
tion, Employer–Appellant.**

**No. 17361.**

Court of Appeals of New Mexico.

June 23, 1997.

George Wright Weeth, Albuquerque, for Worker–Appellee.

R. Morgan Lyman, Las Cruces, for Employer–Appellant.

## OPINION

ALARID, Judge.

1. Employer appeals an unfavorable compensation order entered in this workers' compensation case. Employer raises the following issues on appeal: (1) whether the workers' compensation judge (WCJ) erred in refusing to find that an independent intervening event caused Worker's injury, rather than the original work-related accident; (2) whether the WCJ should have issued an order precluding Worker from obtaining back surgery as a reasonable medical treatment for his condition; (3) whether the WCJ erred in assigning a 38% permanent partial disability (PPD) rather than the 13% that Employer wanted; and (4) whether the rule of the Workers' Compensation Administration (WCA) that requires employers to initiate and pay for telephonic conference call hearings is invalid. We affirm.

## BACKGROUND

2. In October 1994, Worker was injured in an on-the-job accident of which Employer had notice. Worker hurt his back while lifting a thirty-five pound sheet of plywood onto a roof. He went to a chiropractor for treatment and returned to work after December 3, 1994. On that date, Worker was seen by a medical doctor at Family Medical Center in Las Cruces, who ordered him not to return to work. Worker began to receive temporary total disability (TTD) benefits. Nine days later, Worker saw Dr. Thomas G. Easter, another doctor at the Family Medical Center. Dr. Easter diagnosed Worker's injury as a lumbar strain or sprain, an injury to the muscles of the lower back. He did not

think Worker had a herniated disc at that time, although he did notice the presence of pain in Worker's left leg, or left-leg sciatica. Worker began to attend physical therapy sessions despite his continued complaints not only of back pain but of the left-leg sciatica. At times, however, his pain lessened, so much so that Dr. Easter released him to light duty in January 1995. At the end of January and early February, Worker still reported that he was unable to do his physical therapy exercises, due to the pain he continued to suffer.

3. On February 3, 1994, Dr. Easter saw Worker again and diagnosed Worker as having some disc herniation, rather than simply a lumbar strain or sprain. According to Dr. Easter, Worker's pain was much worse and he reported having slipped and fallen in the shower. Worker testified, however, that he slipped and caught himself, but did not fall. Dr. Easter testified that Worker's fall in the shower, rather than the original accident at work, was the cause of the herniation, and referred Worker to Dr. Michael J. Mrochek for treatment. Dr. Mrochek in turn referred Worker to a surgeon named Dr. Richard N. Castillo for a determination as to whether Worker should undergo back surgery. Dr. Castillo did not recommend such surgery and stated that Worker was magnifying his symptoms. Worker was transferred back to Dr. Mrochek for conservative treatment.

4. At the end of April 1995, Worker participated in a physical capacities evaluation that concluded Worker could perform certain activities. Dr. Mrochek determined that Worker was at maximum medical improvement (MMI) as of May 1, 1995, assigned a 10% impairment to the whole body, and released Worker for light-to-medium work. Employer stopped paying Worker TTD benefits in June 1995 and began paying him permanent partial disability benefits at a rate of 13%.

5. Worker testified he understood he was no longer to be treated by Dr. Mrochek and went to see Dr. Dennis Garcia, who referred Worker to Dr. Joseph Ford, a back surgeon. Dr. Ford recommended that Worker have back surgery, but did not perform the surgery pending resolution of the issue of whether Employer would be responsible for payment. During this time, Worker filed a claim for compensation benefits, attacking Employer's elimination of the TTD benefits.

6. Following a hearing on Worker's claim, the WCJ decided that Worker's herniated disc was caused by the work-related injury, rather than by the subsequent unrelated incident as claimed by Employer. The WCJ also determined that Worker should receive PPD benefits at a rate of 38%, from the May 1, 1995, date of MMI, and declined to interfere in the physician/patient relationship between Worker and his current treating physicians. Instead, the WCJ expressly found that if Worker chose to undergo back surgery, and such surgery was still recommended by his current physicians or by an independent expert agreed to by the parties, the surgery would be a reasonable medical treatment and Employer would be responsible for paying for the surgery.

7. Worker subsequently filed a motion to clarify the compensation order, and a telephonic hearing was held on that motion. Employer, who is located in Las Cruces, was required to initiate the conference call to the WCJ and Worker, who were in Albuquerque. Over Employer's objections, they were also required to pay for the call. In addition, the WCJ entered an amended compensation order requiring Employer to pay TTD benefits if Worker should undergo surgery, and allowing Worker to file a claim to attempt to establish a retroactive right to TTD benefits from May 1995 to the date of surgery. Employer appealed the compensation order, as amended, raising the issues set out previously.

## DISCUSSION

### I. Causation

8. This issue is a classic substantial evidence question on an appeal from an administrative agency. Employer argues that a review of the whole record establishes that the WCJ's rejection of Dr. Easter's causation opinion was unreasonable and should not stand. We disagree.

9. There was ample evidence supporting the WCJ's determination that the original accident, rather than the February 3

incident, caused Worker's disc herniation. First, Dr. Ford directly testified that Worker injured his back when he lifted the plywood and has had a lumbar disc herniation since that time. Dr. Ford explained that it is not possible to have a lumbar strain or sprain that also causes sciatica, that Worker had complained of left-leg sciatica from his first appointment with Dr. Easter, and therefore the herniation was present from the beginning and did not occur on February 3. Second, Employer's own witness, Dr. Mrochek, testified that he could not look at the fall in the shower as the cause of Worker's disc problem, because Worker had radicular pain (pain in his leg) before the shower incident and because the results of Worker's EMG test (a test of the nerves) showed that the damage to Worker's nerves had occurred before February 3. Dr. Mrochek stated that it was possible that Worker had exacerbated the already existing condition on February 3. Finally, Worker himself testified that he did not fall in the shower, as Dr. Easter had thought, but only slipped. He attributed the different accounts to a translation problem, since Worker speaks primarily Spanish.

10. In the face of this direct evidence contradicting Employer's position, Employer argues that Dr. Easter's opinion should be given greater weight, because he was the treating physician who saw Worker before and after the February 3 incident. Accepting Employer's argument would require that a prior treating physician's opinion never be subject to question, since the subsequent physician's testimony would always be less persuasive than the original physician's. We decline to adopt such a position, particularly in this case, where there is a plethora of evidence indicating that Dr. Easter's original diagnosis was incorrect or at least incomplete, and also that his opinion that a critical event occurred on February 3 was wrong.

11. We note initially that Dr. Easter is not a board certified orthopedist, while Dr. Ford has such certification. Both Dr. Ford and Dr. Mrochek testified that there was damage to Worker's nerves, caused by pressure from a disc bulge or herniation, prior to February 3. The reason for both doctors' opinions was Worker's leg pain, which was present in December when Dr. Easter first examined Worker. Dr. Easter, while noting the presence of left-leg sciatica, failed to realize the significance of such pain and diagnosed only a lumbar strain or sprain, which casts doubt on his diagnosis.

12. Reviewing the whole record in this case, as we are required to do, we hold that there was substantial evidence to support the WCJ's determination that Worker's disc herniation was caused by his October 1994 injury, as opposed to the subsequent incident on February 3, 1995. *See Bryant v. Lear Siegler Management Servs. Corp.*, 115 N.M. 502, 504, 853 P.2d 753, 755 (Ct.App.1993) (under whole record review standard, reviewing court considers the evidence in the light most favorable to the WCJ's decision, but must include contravening evidence in determining whether substantial evidence supports that decision).

## II. Treatment

13. Employer relies on Dr. Castillo's opinion that Worker does not need surgery, and is not a good candidate for surgery. Dr. Mrochek also testified that he would not operate on Worker if he were a surgeon. Dr. Ford, however, stated categorically that the best way to heal Worker's back is to have a laminectomy and disc excision, and remove the disc material that is pressing on Worker's nerve. He also testified Worker is a good candidate for surgery who is not a malingerer, and a conservative approach to Worker's condition would not work because it has already been attempted unsuccessfully. This is a substantial evidence issue. The conflicting evidence was resolved against Employer, and we will not reweigh the evidence, even under the whole record standard of review. *Bryant,* 115 N.M. at 504, 853 P.2d at 755 (reviewing court does not reweigh the evidence, but determines only whether there is sufficient credible evidence in the record that a reasonable mind might accept as adequate to support the conclusion reached).

14. Employer argues that Dr. Ford's testimony should be discounted and given no weight because he only evaluated Worker and did not treat him. Dr. Ford evaluated Worker for the purpose of deter-

mining whether he should undergo back surgery, and there is no suggestion that his examination was less than complete. In addition, Employer suggests that Dr. Ford may not be a reliable witness because of a pending malpractice claim. There was no evidence that Dr. Ford was actually at fault in that action. The mere pendency of an unresolved malpractice claim cannot render an otherwise qualified expert's opinion meritless as a matter of law. Knowing Dr. Ford's qualifications and knowing of the issues now raised by Employer, the WCJ chose to give credence to his opinion rather than to Dr. Castillo's or Dr. Mrochek's. We cannot say that a reasonable person would not make a similar choice, under the circumstances of this case. We therefore affirm the WCJ's refusal to preclude back surgery as an appropriate treatment in this case.

■ 15. We note Employer's argument that the WCJ actually failed to make a final ruling on this issue. Instead of approving back surgery outright, the WCJ determined that Worker can undergo back surgery only if he consents to do so after having the risks of the procedure explained to him, through an interpreter, and only if an authorized treating physician decides after a current examination that surgery is warranted. Contrary to Employer's argument, this was a final decision on the issue presented. Employer's position was that surgery should not be considered a reasonable medical treatment in this case and that Employer should not have to pay for such a procedure. This would require the WCJ to inject herself into the physician-patient relationship and preclude the authorized treating physicians from deciding that surgery is a viable option. The WCJ rejected Employer's request, and ruled that the treating physicians are free to recommend surgery as an option and Worker is free to elect surgery. The WCJ's decision is a final ruling on the issue presented by Employer. The fact that Worker may or may not decide to undergo surgery, or that after examining Worker again the treating physician may not recommend surgery, does not make the WCJ's decision equivocal or nonfinal. Employer has effectively been removed from the decision-making process concerning the best way to treat Worker's condition, and this removal is a final decision on Employer's request to be allowed to place restrictions on that process.

## III. Disability Percentage

16. Employer contends that the WCJ erred in awarding Worker PPD benefits of 38%, under the point system established in NMSA 1978, Sections 52–1–26 to –26.4 (Repl. Pamp.1991) (effective January 1, 1991). The WCJ awarded Worker no points for his age, under Section 52–1–26.2; two points for his education level of sixth grade, under Section 52–1–26.3(B); four skills points under Section 52–1–26.3(C); one point under Section 52–1–26.3(D), for inability to complete a specific vocational pursuit; and four points under Section 52–1–26.4, for the physical capacity modifier. Multiplying the other points by the four physical capacity points gave a result of twenty-eight, which was added to the 10% impairment to make the total PPD award 38%. *See* Section 52–1–26.1 (providing method of calculating PPD level). Employer challenges the award of four skills points, one vocational pursuit point, and four physical capacity points. According to Employer, Worker should have been awarded only one skills point, no vocational pursuit point, and one physical capacity point. Under Employer's calculation, Worker would be entitled only to a 13% PPD level. We address each of Employer's challenges below.

### A. Skills Points

■ 17. Skills points are awarded under Section 52–1–26.3(C). A worker's skills are measured by reviewing the jobs the worker has successfully performed during the ten years preceding the disability determination. *See Levario v. Ysidro Villareal Labor Agency*, 120 N.M. 734, 736–37, 906 P.2d 266, 268–69 (Ct.App.1995). The term "successfully performed" means that the worker must have remained on that job for the length of time necessary to meet the specific vocation preparation (SVP) time requirement for the job, as established in the Department of Labor, *Dictionary of Occupational Titles* (4th Ed.1991) (*Dictionary*). A worker's skills points are based on the highest SVP level

demonstrated by the worker in the jobs the worker has successfully performed in the relevant ten-year period. *See Levario,* 120 N.M. at 736–37, 906 P.2d at 268–69. In order to determine the proper number of points to award, the WCJ must examine a worker's employment history. SVP points are assigned to each job that the worker performed for over two years during the relevant ten-year period. The highest SVP point job will be the basis for the skills points determination.

18. Employer argues that Worker's highest SVP job was the carpenter position, which has an SVP of 7 and would be worth only one point under Section 52–1–26.3(C)(4). *Dictionary,* DOT Job Code 860.381–022. In response, Worker points out that according to the testimony presented at trial, Worker only worked as a carpenter for a few months during the statutory ten-year period. The disability determination was made in early 1996. From 1982–85, a period that is irrelevant under Section 52–1–26.3, Worker was employed as a carpenter. From that point until some time in 1994, Worker held various jobs that the parties have classified as farm work. Starting in late 1993 or early 1994, Worker began to work in the construction field. Since Worker was injured in October 1994 and stopped working in December 1994, he did not work as a carpenter for the requisite amount of time to be assigned an SVP of 7.

■ 19. Employer does not contest the evidence concerning the amount of time Worker spent employed as a carpenter during the relevant time period. Instead, Employer raises a judicial estoppel argument. According to Employer, Worker conceded below that his highest SVP was 7, as a carpenter, and Worker should not now be able to contest that figure. Employer bases this contention on the fact that Worker submitted requested findings, adopted by the WCJ, which read as follows:

18. In the past 10 years, Worker has been employed as a *Carpenter (DOT No. 860.381–022), and Farm Worker, General II (DOT No. 421.687–010)*

19. Worker's jobs have had specific vocational preparation levels and exertional levels as listed below:

| Job Title | DOT No. | SVP | Exertion |
|---|---|---|---|
| Carpenter | 860.381–022 | 7 | Heavy (mod.) |
| Farmworker Gen. II | 421.687–010 | 2 | Heavy |

■ 20. Employer argues that Worker, by requesting the above findings, conceded that his highest SVP level was as a carpenter, and that Worker cannot now argue that his carpentry work did not qualify for an SVP assignment under Section 52–1–26.3(C). We disagree. Judicial estoppel is a doctrine that prevents a party who has successfully assumed a certain position in judicial proceedings from then assuming an inconsistent position, especially if doing so prejudices a party who had acquiesced in the former position. *Johnson v. Aztec Well Servicing Co.,* 117 N.M. 697, 700, 875 P.2d 1128, 1131 (Ct. App.1994). The doctrine is not applicable in this case for two reasons. First, it does not appear that Worker was assuming the position that Employer now asserts he did; and second, it does not appear that Employer has been prejudiced in any way by Worker's supposed change of position.

21. We point out that Worker did not request a finding that he had performed either the carpenter work or the farm work for more than the minimum time required under Section 52–1–26.3. Worker asserted only that he had performed each of these jobs within the past ten years, and that under the *Dictionary* the carpenter position has an SVP of 7, while the farm worker position has an SVP of 2. Worker did not request that he be assigned an SVP of 7 for his carpentry work. Instead, he specifically requested four skills points, which would correlate to an SVP of 2. It appears, therefore, that Worker's description of the carpenter position in his requested finding, as having an SVP of 7 is a description of the job in general, not an admission that he personally had satisfied the requirements necessary to be assigned an SVP of 7. Given Worker's other requested finding, asking for four skills points rather than one, we do not find the kind of inconsistency in this case that would mandate that judicial estoppel be invoked. *See Johnson,* 117 N.M. at 701, 875 P.2d at 1132 (where worker's previous position was

not necessarily inconsistent with his present position, judicial estoppel did not apply).

22. Significantly, there is no indication in this case that Employer was prejudiced in any way by Worker's requested findings. At the hearing before the WCJ, neither party raised the SVP issue. Worker did not argue for an SVP of 7, or of anything for that matter. Instead, his entire closing argument was directed toward the causation issue and the surgery question. Employer argued that Worker's PPD, if any, should be only 13%, but Employer did not have to acquiesce in or reject any position espoused by Worker concerning the skills points, since Worker had indicated no position at that point. Subsequently, Employer received Worker's requested findings, which contained the statement that the carpenter position has an SVP of 7 but which also clearly requested a skills point award of four points rather than one. To respond to this request, it was incumbent on Employer to review the evidence presented at the hearing and provide a factual basis to the WCJ for Employer's position that Worker should only receive one point. Worker's requested findings could not have given Employer the indication that Worker was conceding that he should receive only one skills point. Therefore, Worker's position concerning the skills points did not affect Employer in any way and Employer has not demonstrated that it was prejudiced by Worker's conduct. On this basis also, we reject the argument that judicial estoppel should be applied in this case. *Johnson,* 117 N.M. at 700, 875 P.2d at 1131 (noting that judicial estoppel is applied especially where one party is prejudiced by the other party's change of position).

23. As we pointed out above, the WCJ's award of four skills points, based on the farm worker's position of an SVP of 2, was supported by the evidence presented in this case, and in fact there was no evidence that would have supported a lower award. Since we have rejected Employer's judicial estoppel argument on this issue, we affirm the WCJ's award.

**B. Specific Vocational Pursuit Point**

24. We have recently interpreted Section 52–1–26.3(D), concerning the voca-

tional pursuit points. *Medina v. Berg Constr., Inc.,* 122 N.M. 350, 355–56, 924 P.2d 1362, 1367–68 (Ct.App.1996). We determined that a worker should receive one point if, at the time of the disability rating, the worker could no longer perform any of his or her former occupations. *Id.* The question in this case, therefore, is whether there was evidence that Worker could no longer perform any of his prior occupations at or after the date of the hearing. *See Levario,* 120 N.M. at 739, 906 P.2d at 271 (phrase " 'at the time of the disability rating' " means the time a judicial determination is made of the worker's disability level, rather than the date the worker reaches MMI). The WCJ found, and Employer does not dispute, that Worker's prior employment had been as a carpenter and farm worker. The WCJ also classified both the farm worker occupation and the carpenter position as heavy labor positions. Employer does not challenge the classification of farm work as heavy. Employer does, however, argue that the carpenter position involved only medium work, that Worker is physically capable of performing medium work, and that Worker can therefore pursue his prior vocation and should get no vocational pursuit points.

25. Employer's argument concerning the carpenter position is based on the testimony presented regarding the specific job Worker was employed in when he was injured. Employer does not argue that carpenter positions in general are classified as medium labor, and that even if Worker cannot return to the specific job he was performing he is able to work as a carpenter in some capacity. *See Dictionary,* DOT Job Code 860.381–022 (carpenter work in construction field rated as medium strength occupation). We therefore need not decide whether Section 52–1–26.3(D) refers to a specific job within a general classification that can no longer be performed, or whether the legislature intended to deny a point to a worker who is physically capable of performing any job within a particular vocation, whether or not the worker has performed that particular job in the past. Instead, we determine only whether there is evidence that Worker can no longer fulfill the

duties of the particular carpenter position he held prior to his injury.

26. Viewing the evidence as a whole, we reject Employer's argument that Worker's position was a medium labor position. Worker testified that a portion of his duties consisted of raising a house frame weighing three to four hundred pounds, with the assistance of two or three other employees. Therefore, his position was properly classified as heavy. *See* Section 52–1–26.4(C)(1) (a physical capacity for heavy labor means the ability to lift over fifty pounds occasionally); *Dictionary,* Appendix C (defining heavy labor as exerting fifty to one hundred pounds of force occasionally, and very heavy work as exerting in excess of one hundred pounds occasionally).

27. Affirming the classification of Worker's prior employment as heavy makes the rest of the analysis simple. There was ample evidence that Worker cannot perform heavy labor, including Employer's own admission that Worker's physical capacity is medium, the restrictions placed on Worker by Dr. Mrochek, and the fact that Worker's current treating physician has restricted Worker to no work. Since Worker cannot perform heavy work, and his previous occupations as carpenter and farm worker involved heavy labor, he is entitled to a vocational pursuit point because he cannot perform any of his previous work. *See Medina,* 122 N.M. at 355, 924 P.2d at 1367.

### C. Physical Capacity Modification

28. Points for a worker's residual physical capacity are awarded under Section 52–1–26.4, and are based on a comparison of the usual and customary work the worker was performing prior to the injury, with the worker's physical capacity after the injury. Employer argues that Worker should have been awarded only one point, rather than the four points that were awarded, because Worker's usual and customary work as a carpenter had only a medium exertional level, and Worker is still able to perform at such a level. As we pointed out above, however, there was evidence from which the WCJ could conclude that Worker's job as a carpenter required an exertional level that was heavy rather than medium, and it is undisputed that Worker's farm work was heavy. Therefore, the WCJ could properly determine that the physical capacity necessary to perform Worker's usual and customary work was heavy. In addition, the greatest residual physical capacity that any physician assigned to Worker was a medium level. Under the evidence presented at the hearing and under Section 52–1–26.4(B), Worker was entitled to at least the four points awarded by the WCJ for the physical capacity modification.

29. Having affirmed all of the points awarded by the WCJ, we also affirm the 38% disability award, calculated by multiplying seven (education points plus skills points plus vocational pursuit point) times four (residual physical capacity points), and adding the result of twenty-eight to Worker's 10% impairment.

### IV. Conference Call

30. Employer challenges the validity of WCA Rule 92.5.2(G), which requires employers or insurers to initiate, and therefore pay for, all conference calls. Employer argues that it should not have to pay for conference calls held to address motions filed by Worker, such as the conference call hearing held in this case on Worker's motion to clarify the original compensation order. Employer asks us to conclude that the rule is invalid, thus giving Employer "the remedy to pursue a claim against the Worker's Compensation Administration for the costs La Mesilla incurred for a conference call which the WCJ should have initiated." Alternatively, Employer asks us to place the burden of initiating the call on Worker, since the call concerned a motion filed by Worker.

31. We conclude that in this appeal we cannot address the issue raised by Employer. There are two ways to view Employer's request that we invalidate Rule 92.5.2(G). First, the request that we declare the rule invalid, so that Employer may pursue reimbursement from the WCA, can be seen as a request that we directly review the validity of the regulation in the abstract, rather than as applied to this case. It is also

possible that Employer is raising this issue as an issue concerning the assessment of costs in this particular case. For the reasons that follow, we hold that we have no appellate jurisdiction to review and invalidate regulations promulgated by the WCA. We also hold that, to the extent Employer's challenge is to the particular costs of the particular call involved in this case, there is no final, written judgment addressing that issue and we may not consider the question at this point.

32. Our jurisdiction over appeals from the WCA is governed by statute. *Sun Country Physical Therapy Assocs., Inc. v. New Mexico Self–Insurers' Fund,* 121 N.M. 248, 249, 910 P.2d 324, 325 (Ct.App.1995). In the absence of a statutory provision authorizing an appeal from a certain action taken by the WCA, we cannot entertain the appeal. *Id.* It does not appear that the relevant statutory provisions authorize us to directly review regulations promulgated by the WCA. *Compare* NMSA 1978, §§ 52–5–4 & –4.1 (Repl. Pamp.1991) (provisions concerning WCA's power to promulgate rules and regulations, containing no language regarding appellate judicial review of those rules and regulations), *with* NMSA 1978, § 61–1–31 (Repl. Pamp.1996) (authorizing review by Court of Appeals of regulations adopted by certain boards and agencies). We therefore hold. that we cannot simply declare Rule 92.5.2(G) invalid, as a general matter, in this appeal. *Cf. Sun Country,* 121 N.M. at 250, 910 P.2d at 326 (this Court must observe its jurisdictional limits, even if parties are relegated to more cumbersome methods of obtaining review of order entered by director of WCA).

33. We do not rule out the possibility that we could overrule the application of a particular regulation to a particular case, as being inconsistent with the WCA's statutory authority. *See* § 52–5–4(A) (WCA's rules and regulations are binding if not inconsistent with law). In this case, however, there is no final, written judgment for us to review, ordering that Employer bear the costs of the call that it initiated. Employer filed this appeal from the compensation order entered by the WCJ, which contains no mention of the conference call or the costs of that call. There has been no indication of the actual

cost, and Employer has apparently made no formal request for reimbursement that could be addressed in a written order. No order assessing costs is before us for our review. Employer objected to having to initiate the call, but the WCJ orally dismissed that objection. Employer did not request a specific form of relief such as reimbursement from the WCA or assessment of the cost of the call to Worker. Without a written judgment carrying out the WCJ's oral ruling and requiring that Employer bear a particular amount of costs for the call, we cannot review the issue Employer now seeks to raise. *See Vigil v. Thriftway Mktg. Corp.,* 117 N.M. 176, 178, 870 P.2d 138, 140 (Ct.App.1994) (oral rulings of WCJ are not final and therefore not a proper basis for appeal). We note that obtaining a formal ruling and filing an appeal from that ruling would, in addition to curing the jurisdictional problem discussed above, clearly notify the real party in interest (the WCA) of the challenge to its rule and allow the WCA to take steps to defend its rule.

**CONCLUSION**

34. Based on the foregoing, we affirm the disability award to Worker, and the decision to allow Worker to undergo back surgery if an authorized treating physician or agreed-upon expert recommends that course of treatment. We decline to address Employer's issue concerning Rule 92.5.2(G). The compensation order entered by the WCJ is therefore affirmed in its entirety. Worker is awarded $3,000 for the services of his attorney on appeal, assuming that this amount would not raise the total fees awarded in this case to an amount greater than the $12,500 cap set by NMSA 1978, Section 52–1–54(I) (Cum.Supp.1996).

35. **IT IS SO ORDERED.**

APODACA and BUSTAMANTE, JJ., concur.